# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**RICK MELVILLE,**

        Plaintiff,

      **-vs-**                         **Case No. 13-CV-972**

  **JAMES GREER, MR. GOLDEN,**
  **CARRIE SPRANGER, MS. WATTS,**
  **JANE DOES 1-3, DR. JOSEPH,**
  **DR. MURPHY, and DANIELLE FOSTER**

        Defendants.

---

# DECISION AND ORDER

---

Rick Melville, a *pro se* plaintiff, filed a civil rights action pursuant to 42 U.S.C. § 1983. (ECF No.1.) The Court screened the plaintiff's complaint pursuant to 28 U.S.C § 1915A(a) and allowed the plaintiff to proceed with his claim that the defendants violated his Eighth Amendment rights by being deliberately indifferent to his serious medical need for treatment of chronic nerve pain. (ECF No. 16.) This matter is now before the Court on the defendants' motion for summary judgment. (ECF No. 11.) The plaintiff responded on October 10, 2014 (ECF Nos. 123-27), and supplemented his response on November 25, 2014 (ECF No. 138). The defendants did not file a reply brief addressing the plaintiff's response. For the reasons set forth below, the defendants' motion for summary judgment

will be granted as to defendants Greer, Watts, Golden, Foster, and Spranger, but will be denied as to defendants Joseph and Murphy.

## I. RELEVANT FACTS[1]

### A. The Plaintiff's Injury and Place of Incarceration

The plaintiff suffered a gunshot wound in 2009, injuring a major artery in his right leg. As a result, the plaintiff suffers from chronic nerve pain in his leg and has difficulty walking. This pain is exacerbated in cold weather and when the plaintiff has to walk long distances. The plaintiff also suffers from other ailments unrelated to his 2009 injury, including, but not limited to, gastroesophageal reflux disease (GERD), back spasms, drop foot, and depression.

The plaintiff was incarcerated at the Milwaukee Secure Detention Facility (MSDF) from June 5, 2012, until December 28, 2012, when he was transferred to the Dodge Correctional Institution (DCI). The plaintiff remained at DCI until April 12, 2013, when he was transferred to the Oshkosh Correctional Institution (OSCI). The plaintiff remained at OSCI until his release to active community supervision on March 10, 2015.

---

[1] The facts in this section are primarily taken from the defendants' Proposed Findings of Fact (DPFF) (ECF No. 113), the plaintiff's declaration and sworn response to the defendants' argument and DPFF (ECF No. 125), and the exhibits to those filings. Citations to those documents are included only for disputed facts.

- 2 -

## B. The Plaintiff's Claims

While at MSDF, the plaintiff was under the care of defendant physician Manuel Joseph, M.D. While at OSCI, the plaintiff was under the care of defendant physician Patrick Murphy, M.D. (The plaintiff has not identified Jane Does 1-3, the physician and/or health care staff while the plaintiff was at DCI.)

Despite voluminous filings, the plaintiff's claims are rather simple: The plaintiff states that the defendant physicians at MSDF (Joseph), DCI (Jane Does 1-3), and OSCI (Murphy) failed to treat the nerve pain in his right leg for more than a year. The plaintiff states that the first treatment he received for nerve pain (as opposed to other ailments) was in July 2013, after the plaintiff notified defendant Murphy of his intent to pursue litigation. The defendants, unsurprisingly, disagree with the plaintiff's characterization of his treatment (or lack thereof).

Defendant Joseph states that while the plaintiff was at MSDF, Joseph "added, discontinued, and adjusted medications as appropriate, attempted to obtain [the plaintiff's] previous treatment records from Froedtert Memorial Hospital, and ordered lab work, a knee brace, a special state-issued shoe, a wheel chair [sic] for traveling longer distances, and a Physical Therapy evaluation . . . ." (DPFF ¶ 28.)

- 3 -

Defendant Murphy states that he saw the plaintiff "on at least eight occasions" (all after July 17, 2013) and that "medication trials included Ibuprofen, Duloxetine, and Nortriptyline." (DPFF ¶¶ 32-33.) In addition, defendant Murphy states that he ordered Physical Therapy, tried a TENS unit, and offered the plaintiff a low bunk, a low tier, a bed wedge, a cane, heel inserts, a wheelchair for distance, and a different housing unit to minimize the plaintiff's time in the cold. (*Id.* at ¶ 34.) Defendant Murphy sought authorization to send the plaintiff to the UW Pain Clinic for referral on February 21, 2014; the plaintiff was seen at the clinic on June 2, 2014. (*Id.* at ¶ 38.)

The plaintiff rejects the defendants' account of his treatment. The plaintiff explains that when he entered MSDF, he explained to defendant Joseph that he had been on the highest dose of Gabapentin since 2009, but that the medication was no longer working as it once had. (ECF No. 125 pp. 1, 5, 10, 20.) In response to the plaintiff's complaints, defendant Joseph significantly *decreased* the plaintiff's dosage and, according to the plaintiff, did nothing to account for the diminished dosage. (*Id.* at 10.) The plaintiff states that lowering the dosage without compensating for the decrease significantly increased his nerve pain and suffering. (*Id.* at 1, 5, 10, 20.) He states that the list of medications identified by defendants Joseph and

- 4 -

Murphy are "red herrings," because none are indicated to treat nerve pain[2] but were prescribed for other ailments such as his back spasms. (*Id.* at 20, 21, 22.)

The plaintiff also explains that the non-medicinal measures were merely "band aids" or a "joke" because they did nothing to alleviate his nerve pain but instead were offered only to address complications arising as a result of his nerve pain. (ECF No. 125, pp. 2, 23.) The plaintiff's grievances are riddled with complaints that the shoe he was given was the wrong size and had a hole in the bottom that had to be plugged with cardboard to keep the snow and dirt out, the lack of gauze for the knee brace rubbed his leg raw, and the wheelchair, for which he had no pusher, was too wide for him to maneuver on his own. (ECF No. 126, Ex. 13-14.)

Finally, the plaintiff notes that all of the appointments he had during his first three months at OSCI were with low level staff who continually pushed him off, telling him he needed to wait and describe his symptoms to the physician at a later date. (ECF No. 125, p. 17.) The plaintiff and defendant Murphy agree that the plaintiff was not seen by

---

[2] The plaintiff references previously filed drug fact sheets for each of the prescribed medications to demonstrate that none are indicated for the treatment of nerve pain. (ECF No. 94, Ex. 1.)

- 5 -

defendant Murphy until July 2013, three months after the plaintiff was transferred to OSCI.

The plaintiff states that it was not until he informed defendant Murphy in July 2013 of his intention to pursue litigation that *any* attempt to treat the plaintiff's nerve pain was made (in the form of a prescription for Duloxetine, a drug indicated for nerve pain). (ECF No. 125, pp. 14, 19, 22.) Since July 2013, the plaintiff states that various unsuccessful attempts (via medication and otherwise) have been made to treat his nerve pain, but the plaintiff argues that everything attempted after July 2013 should be disregarded because they are not "within the timeline of this complaint." (ECF No. 125, p. 21.)[3] The plaintiff states that the timeline for his deliberate indifference claim ends on July 17, 2013, the first time any attempt to treat the nerve pain was made. In other words, although these post-July 2013 efforts were unsuccessful, the plaintiff apparently concedes that reasonable efforts were ultimately made.

---

[3] The plaintiff complains at length about the failure of these post-July 2013 attempts to treat his nerve pain; however, based on the plaintiff's repeated statements that the "timeline of his complaint" ends when defendant Murphy prescribed Duloxetine in "a reasonable attempt" to treat the plaintiff's nerve pain, the Court will not consider these statements to be part of the plaintiff's deliberate indifference claim against the defendants. (*See, e.g.*, ECF No. 125, p. 19, 21, and 27.)

- 6 -

## C. The Plaintiff's Grievances and Complaints

The plaintiff states that while at MSDF he raised his concerns not only to defendant Joseph, but also to defendant Tina Watts, the Nursing Supervisor in the Health Services Unit (HSU) at MSDF. Similarly, the plaintiff states that while at OSCI, he continuously complained about the lack of treatment not only to defendant Murphy, but also to defendant Danielle Foster, HSU Manager at OSCI, defendant William Golden, Assistant HSU Manager at OSCI, and defendant Carrie Spranger, Institution Complaint Examiner (ICE) at OSCI. The plaintiff also provided the Court with two letters he wrote to defendant James Greer, the Director of the Bureau of Health Services (BHS). The plaintiff wrote the first letter while at MSDF and the second letter while at DCI.

The defendants do not disagree that the plaintiff filed numerous grievances. While at MSDF, the defendants state that the plaintiff filed fourteen inmate complaints, only one of which was appealed following its rejection due to procedural deficiencies (*i.e.*, the merits of the complaint were not addressed). (DPFF ¶ 80; Rose Aff. ¶ 5 and attachments.) In addition, defendants Watts, Foster, and Golden clarify that, "[w]hile they may have spoken to [the plaintiff] about his medical concerns during his incarceration at MSDF or OSCI, or responded to [a Health Service

- 7 -

Request], at no time did they personally treat Melville; they had no involvement with the decisions made regarding his medical treatment." (DPFF ¶ 58.) Similarly, defendant Greer states that he "does not personally treat inmate patients nor does he personally supervise their care. This is the function of the health care professionals employed in the Health Services Unit (HSU) at the inmate's housing institution, in consultation with additional outside providers, as necessary. [He] has never medically treated the plaintiff, nor does he have the duty or responsibility to do so." (Greer Aff. at ¶8.)

The plaintiff states that, while at MSDF, he had no intention of filing litigation, but by the time he was transferred to DCI and then to OSCI, it was apparent that "the same action [was] going on" and that the "pattern [was] continu[ing]." (ECF No. 125 p. 18.) At that point, plaintiff states he "exhausted available administrative remedies . . . to the highest level." (*Id.*) The defendants do not dispute that the plaintiff exhausted available administrative remedies at OSCI, though they state the plaintiff failed to exhaust available remedies at MSDF.

## II.   SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

- 8 -

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### III.   ANALYSIS

The defendants argue for dismissal on various bases: (1) Defendants Joseph and Watts contend that the plaintiff did not exhaust available administrative remedies while at MSDF, so they must be dismissed as defendants; (2) Defendants Greer, Foster, Golden, and Watts contend they had no personal involvement with the plaintiff's claim, so they must be dismissed as defendants; (3) Defendants Murphy, Joseph, and Spranger contend they were not deliberately indifferent to the plaintiff's need for medical treatment, so they must be dismissed as defendants; and (4) All defendants contend they are entitled to qualified immunity.

### A. Exhaustion of Available Administrative Remedies

Prisoners must exhaust all available administrative remedies in accordance with prison procedural rules before pursuing claims, including § 1983 actions, in federal court. *Turley v. Rednour*, 729 F.3d 645, 649 (7th Cir. 2013). "Exhaustion is an affirmative defense, with the burden of proof on the defendants." *Id.* (citing *Maddox v. Love*, 655 F.3d 709, 720 (7th Cir. 2011)). The defendants concede that the plaintiff exhausted available remedies at OSCI; however, defendants Joseph and Watts claim that the

plaintiff failed to exhaust available remedies at MSDF, and therefore summary judgment should be granted in their favor.

The plaintiff states that he has suffered from chronic nerve pain since 2009 and that he complained of the pain to numerous health care staff and physicians at several different prison facilities. His claim originates not from an isolated event, but from what he describes as a pattern of deliberate indifference, starting shortly after his entry to MSDF[4] and ending more than a year later when defendant Murphy prescribed him medication specifically indicated for the treatment of nerve pain.

Given the ongoing nature of medical conditions (including chronic pain), the Seventh Circuit has held that "deliberate indifference to a serious medical need is a continuing violation that accrues when the defendant has notice of the untreated condition and ends only when treatment is provided or the inmate is released." *Jervis v. Mitcheff*, 258 Fed. Appx. 3, 5-6 (7th Cir. 2007) (citing *Heard v. Sheahan*, 253 F.3d 316, 318-19 (7th Cir. 2001)). Courts have previously explained the rationale for

---

[4] The plaintiff entered MSDF in June 2012; however, he makes several references to the lack of treatment beginning in 2011. Although not clear from the filings, it appears that the plaintiff was previously incarcerated in 2011, released, then re-incarcerated in June 2012. Given the plaintiff's release prior to 2012 and resulting termination of the defendants' obligations for the plaintiff's medical care, the accrual date of the plaintiff's continuing violation is June 2012, not 2011.

- 11 -

the doctrine of continuing violations in the context of chronic medical conditions:

> For an acute medical condition, like a heart attack or a diabetic coma, the time of the failure to treat (and therefore the time of the Eighth Amendment violation) can be determined with some precision, and therefore the time limit for filing a grievance can be readily established. Such is not the case for a chronic medical condition that is ignored, or for which treatment is delayed or inadequate. The seriousness of a chronic condition may not become obvious to prison officials until some time passes, and the indifference to that condition—and the resulting pain suffered by the prisoner that equates to the infliction of punishment—may not become manifest until then as well. Such a condition is properly identified as "ongoing," and a grievance that identifies the persistent failure to address that condition must be considered timely as long as the prison officials retain the power to do something about it.

*Meeks v. Suliene*, No. 11-c-54, 2012 WL 5985482, at *3 (E.D. Wis. Nov. 29, 2012) (quoting *Ellis v. Vadlamudi*, 568 F.Supp.2d 778, 783-84 (E.D. Mich. 2008)); *see also Turley*, 729 F.3d at 651 ("A violation is continuing where 'it would be unreasonable to require or even permit [a prisoner] to sue separately over every incident of the defendant's unlawful conduct.'") (citations omitted).

Here, the relevant question is whether "prison officials were alerted to a constitutional violation, presented an early opportunity to cure the

- 12 -

violation, and whether [the plaintiff] exhausted his available administrative remedies." *See Meeks*, 2012 WL 5985482 at *3. According to the Department of Corrections regulations, an inmate may file a complaint after he has been transferred to a new facility for an alleged violation at the previous facility. Wis. Admin. Code DOC § 310.11(9). As such, the plaintiff's exhaustion of available remedies at OSCI could have been sufficient to alert prison officials to the ongoing constitutional violation which began at MSDF and continued through the plaintiff's transfer to OSCI if the grievance discussed the lack of treatment since his entry to MSDF in June 2012. *See Meeks*, 2012 WL 5985482 at *4 (holding that a plaintiff exhausted administrative remedies with regard to the lack of care from several doctors at different prisons when his complaint clearly referenced the ongoing lack of care demonstrated by the different doctors over time).

The defendants identify a single grievance that the plaintiff fully exhausted while at OSCI; however, they do not indicate whether this is the *only* grievance that the plaintiff fully exhausted while at OSCI. (DPFF at ¶¶ 81-95.) Although in this particular grievance the plaintiff refers to defendants' lack of treatment since April 12, 2013 (the date the plaintiff entered OSCI), the defendants do not foreclose the possibility that

- 13 -

the plaintiff fully exhausted other grievances that sufficiently placed prison officials on notice that the plaintiff had not received treatment for his nerve pain since entering MSDF in June 2012. The plaintiff has stated in his response to the defendants' motion for summary judgment that he "exhausted available administrative remedies . . . to the highest level." (ECF No. 125, p. 18.) The defendants state only that the plaintiff did not exhaust available remedies *while at* MSDF; however, because the lack of treatment was an ongoing violation, the plaintiff could have satisfied his obligation to exhaust while at OSCI with reference to the lack of treatment that had been ongoing since entering MSDF. It is unclear from the record whether this occurred.

Because the Court must construe the facts in a light most favorable to the non-moving party, the Court finds that defendants Joseph and Watts have not foreclosed the possibility that the plaintiff placed prison officials on notice that he had not received treatment for his nerve pain since June 2012, and the Court will deny defendants Joseph and Watts' request for summary judgment on the basis that the plaintiff failed to exhaust available administrative remedies while at MSDF.

- 14 -

## B. Personal Involvement of Defendants Greer, Foster, Golden and Watts

"Section 1983 makes public employees liable 'for their own misdeeds but not for anyone else's.'" *Burns v. Fenoglio*, 525 Fed.Appx. 512, 515 (7th Cir. 2013) (quoting *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009)). The plaintiff blames the HSU nursing supervisor at MSDF (Watts), the HSU manager and assistant manager at OSCI (Foster and Golden, respectively), and the BHS director (Greer) for not forcing defendants Joseph and Murphy to treat his nerve pain in a more timely manner. However, as well established by the Seventh Circuit, "top-level administrators are entitled to delegate to others the responsibility for specific prison functions, including providing medical care." *Burns*, 525 Fed.Appx. at 515 (citing *Burks*, 555 F.3d at 595).

Defendants Greer, Foster, Golden, and Watts have stated that, "[A]t no time did they personally treat [the plaintiff], [and] they had no personal involvement with the decisions made regarding his medical treatment." (DPFF at ¶ 58.) They further state that, "[T]hey do not have the authority to override or alter orders issued by physicians or heath care professionals, nor do they have the ability to write prescriptions or refer inmates to outside specialists." (*Id.* at ¶ 114.)

- 15 -

The plaintiff disputes these statements, insisting that defendants Greer, Foster, Golden, and Watts had personal involvement because "they are management" and part of "the chain of command." (ECF No. 125, p. 25, 33.) This, however, is precisely why the plaintiff's claim against these defendants fails.

"Section 1983 does not establish a system of vicarious responsibility. Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise." *Burks*, 555 F.3d at 593-94 (internal citations omitted). The plaintiff's position that defendants Greer, Foster, Golden, and Watts are liable merely because they "failed in [their] responsibility" to supervise defendants Joseph and Murphy is fatal to his claim. (ECF No. 125, p. 25.) The Court grants summary judgment in favor of defendants Greer, Foster, Golden, and Watts.

## C. The Deliberate Indifference of Defendants Joseph, Murphy, and Spranger

"The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009)); *see also*, *Estelle v. Gamble*, 429 U.S. 97, 103

- 16 -

(1976).  Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs.  *Arnett*, 658 F.3d at 750 (citing *Estelle*, 429 U.S. at 104).  Accordingly, a claim based on deficient medical care must demonstrate two elements: (1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition.  *Arnett*, 658 F.3d at 750 (citing *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)).  "Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution."  *Rodriguez*, 577 F.3d at 828 (quoting *Estelle*, 429 U.S. at 103).

The defendants concede that the plaintiff has satisfied the first element because he suffers from a serious medical condition (*i.e.*, chronic nerve pain); however, they argue that the plaintiff cannot satisfy the second element because defendants Joseph, Murphy, and Spranger were not deliberately indifferent to that serious medical condition.

To demonstrate deliberate indifference, a plaintiff must show that the defendant "acted with a sufficiently culpable state of mind," something akin to recklessness.  A prison official acts with a sufficiently culpable state of mind when he or she knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. *Roe v. Elyea*,

- 17 -

631 F.3d 843, 857 (7th Cir 2011). Deliberate indifference "is more than negligence and approaches intentional wrongdoing." *Arnett*, 658 F.3d at 759 (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)). It is not medical malpractice; "the Eighth Amendment does not codify common law torts." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008).

"A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Arnett*, 658 F.3d at 759 (quoting *Duckworth*, 532 F.3d at 679). A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that "no minimally competent professional would have so responded under those circumstances." *Roe*, 631 F.3d at 857 (quotation marks omitted). However, a prisoner "need not prove that the prison officials intended, hoped for, or desired the harm that transpired." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). "Nor does a prisoner need to show that he was literally ignored." *Arnett*, 658 F.3d at 759 (citing *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). That the prisoner

- 18 -

received some treatment does not foreclose his deliberate indifference claim if the treatment received was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." *Arnett*, 658 F.3d at 759 (quoting *Greeno*, 414 F.3d at 653). However, deliberate indifference is a high standard; it requires proof that the state officials actually knew of the inmate's serious medical need and that they disregarded it. *Walker*, 293 F.3d at 1037.

In addition, delaying treatment of a non-life-threatening but painful condition may constitute deliberate indifference if the delay unnecessarily prolongs an inmate's pain. *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). "[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Id*. (citations omitted).

### i. Defendants Joseph and Murphy

Defendants Joseph and Murphy limit their argument to, "The plaintiff simply cannot produce any expert testimony that no minimally competent professional would have responded as [we] did." (Defs.' Mot. Summ. Judg., ECF No. 112, p. 10.) The defendants either misconstrue or misunderstand the plaintiff's claims. The plaintiff is not merely disagreeing with the course of treatment pursued by defendants Joseph

- 19 -

and Murphy. Rather, the plaintiff repeatedly states that he received *no treatment at all* for his chronic nerve pain until more than a year after entering MSDF when defendant Murphy prescribed Duloxetine, the first prescribed medication actually indicated for the treatment of nerve pain. The plaintiff also states that the so-called treatments set forth by the defendants are not treatments at all because they: (1) Were prescribed for ailments other than his nerve pain (*e.g*, his drop foot, GERD, back spasms, and/or depression); (2) Were prescribed after the "timeline of [the plaintiff's] complaint" (*e.g.*, the Duloxetine, the EMG test, the TENS unit, the referral to the pain clinic all occurred after July 2013, more than a year after the plaintiff entered MSDF); or (3) Were merely band-aids that addressed complications resulting from the nerve pain but did nothing to treat the nerve pain itself (*e.g.*, the knee brace, wheelchair, orthopedic shoe, and thermal socks).

The plaintiff states that upon entry to MSDF he notified defendant Joseph that the nerve medication he had been on prior to entering MSDF (Gabapentin) was no longer working and that defendant Joseph's only response to was to significantly *decrease* the dosage prescribed to the plaintiff. The dosage was later returned to the pre-incarceration level, but in the meantime, the plaintiff states that no other medications indicated

for the treatment of nerve pain were prescribed. The plaintiff was in constant pain and made many complaints, but it was not until more than three months after he entered OSCI and more than a year after he entered MSDF, that defendant Murphy first prescribed a medication specifically indicated for the treatment of nerve pain. Defendants Joseph and Murphy argue that they wanted to explore all medications typically used to treat nerve pain before moving to more invasive treatments, but they do not explain why more than a year passed before a medication specifically indicated for nerve pain was prescribed.

The plaintiff also states that "treatments" other than medication (which the plaintiff states were not actually treatments but merely band-aids), including the knee brace, special shoe, and wheelchair, were woefully inadequate. For example, gauze for the knee brace was not initially provided, so the brace rubbed the plaintiff's leg raw, the shoe was the wrong size and had a hole in the bottom, letting in snow and dirt, and the wheelchair, for which no pusher was provided, was extra wide, making it difficult for the plaintiff to move himself.

The defendants chose not to reply to the plaintiff's response or to address the additional proposed facts set forth by the plaintiff. As such, the plaintiff's proposed facts remain uncontroverted, and the Court will

- 21 -

deem them admitted solely for the purpose of deciding summary judgment. Civil L. R. 56(b)(4).

In light of the foregoing and given that all facts must be construed in a light most favorable to the non-moving party, the Court finds that a genuine issue of material fact exists as to whether defendants Joseph and Murphy were deliberately indifferent to plaintiff's nerve pain. The Court denies summary judgment as to defendants Joseph and Murphy.

ii. Defendant Spranger

Defendant Spranger has been employed as an Institution Complaint Examiner (ICE) at OSCI since November 2012. In that capacity, she serves as the custodian of inmate complaints filed by inmates incarcerated at OSCI. On May 15, 2013, the plaintiff filed an inmate complaint in which he complained that HSU staff were deliberately indifferent to his chronic nerve pain. Defendant Spranger referred the complaint to defendant Golden (the HSU assistant manager). Defendant Golden reviewed the plaintiff's records and informed defendant Spranger that, after the plaintiff transferred to OSCI, the nursing staff completed the intake process and chart review and reviewed and dispensed the plaintiff's medications. Defendant Spranger also learned from her own investigation that the plaintiff had seen medical staff eleven times in just more than a

month and that he had been prescribed additional medication. Finally, upon learning that the plaintiff's appointment with an advanced provider had been "bumped," defendant Spranger recommended that the appointment occur as scheduled.

The plaintiff argues that defendant Spranger has no medical education and is therefore unable to adequately evaluate medical prescriptions or proper treatment for serious medical needs. Even assuming the plaintiff is correct, such a reality does not result in a finding that defendant Spranger was deliberately indifferent to the plaintiff's medical needs. Defendant's Spranger job was to investigate the plaintiff's complaint and determine whether he was receiving medical care; her job was not to evaluate the quality and effectiveness of the care the plaintiff received.

Non-medical officials are entitled to defer to the professional judgment of the facility's medical professionals on questions of medical care. *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008). While a non-medical official is not permitted to do nothing, she has satisfied her obligation when, as here, she responds promptly to the complaint, contacts medical officials, and requests reports and summaries about the medical care provided to ensure herself that no further action is required. *Id.*

- 23 -

Because defendant Spranger was entitled to rely on the professional judgment of the medical staff and because nothing in the plaintiff's medical records made it obvious that he might not be receiving adequate care, the Court will grant summary judgment in favor of defendant Spranger.

## D. Qualified Immunity

"The affirmative defense of qualified immunity protects government officers from liability for actions taken in the course of their official duties if their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To determine if qualified immunity applies, the courts employ a two-prong test: (1) whether the facts, viewed in a light most favorable to the injured party, demonstrate that the conduct of the officers violated a constitutional right, and (2) whether that right was clearly established at the time the conduct occurred. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)." *Hardaway*, 734 F.3d at 743.

The Court has found that defendants Greer, Golden, Watts, Foster and Spranger did not violate the plaintiff's constitutional rights, so the

- 24 -

Court need not consider whether those defendants are entitled to qualified immunity. However, the Court has determined that a question of fact exists regarding whether defendants Joseph and Murphy were deliberately indifferent to the plaintiff's serious medical needs when they delayed treatment for the plaintiff's nerve pain for months (six months for defendant Joseph; three months for defendant Murphy).

"The purpose of the doctrine of qualified immunity is to shield public officers from liability 'consequent upon either a change in law after they acted or enduring legal uncertainty that makes it difficult for the officer to assess the lawfulness of the act in question before he does it.'" *Walker v. Benjamin*, 293 F.3d 1030, 1040-41 (7th Cir. 2002) (quoting *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999)). The general standard for liability under the Eighth Amendment for refusing and/or delaying treatment for a serious medical condition was well established at the time of these events. As such, there is no question that at the time defendants Joseph and Murphy delayed treating the plaintiff's nerve pain (according to the plaintiff's version of events), such an action would give rise to liability under section 1983. Defendants Joseph and Murphy are not entitled to qualified immunity.

### E. Doe Defendants

On March 31, 2014, the Court entered a Scheduling Order requiring the parties to file motions to amend the pleadings or add parties no later than May 26, 2014. (ECF No. 55, p. 1.) The order specified that this deadline applied to the plaintiff's obligation to identify the party or parties he named as Does 1-3. The order was clear that, if the Does were not identified by May 26, 2014, they would be subject to dismissal.

The plaintiff has had more than a year beyond the date in the Scheduling Order to identify the Doe defendants, yet he has failed to do so despite serving numerous interrogatories and requests for documents upon the defendants. Despite voluminous filings, the plaintiff has offered no explanation for his failure to abide by the Court's Scheduling Order, nor has he indicated that identification of the Doe defendants is forthcoming. As such, Jane Does 1-3 are dismissed.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT** "Defendants' Motion for Summary Judgment" (ECF No. 111) is **GRANTED** with respect to defendants Greer, Watts, Golden, Foster, and Spranger, but **DENIED** with respect to defendants Joseph and Murphy. The Court will attempt to find an attorney to represent the plaintiff *pro bono* on his surviving claims.

- 26 -

**IT IS FURTHER ORDERED** that the defendant(s) identified as Jane Doe(s) 1-3 is/are **DISMISSED**.

Dated at Milwaukee, Wisconsin, this 10th day of June, 2015.

BY THE COURT:

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**